Leroy **BIRL**, etc., Plaintiff,

v.

Kenneth **WALLIS**, etc., et al.,
Defendants.

Civ. A. No. 83–T–809–N.

United States District Court,
M.D. Alabama, N.D.

Sept. 4, 1985.

Greg Bass, Demopolis, Ala., Abigail Turner, Legal Services Corp. of Alabama, Inc. Mobile, Ala., for plaintiff.

G.R. Trawick, R. Emmett Poundstone, III, Asst. Attys. Gen., Alabama Dept. of Mental Health, Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This lawsuit challenges the constitutionality of Alabama's mental health procedures for reconfining a person who has been involuntarily civilly committed to a state mental institution and then conditionally released. Plaintiff Leroy Birl has brought this lawsuit pursuant to 42 U.S. C.A. § 1983 against defendant Kenneth Wallis, court-appointed receiver and commissioner of the Alabama Department of Mental Health, and defendant Charles A. Fetner, director of Bryce Hospital, one of the department's residential mental health facilities. The court's jurisdiction has been properly invoked pursuant to 28 U.S.C.A. § 1343.

This lawsuit is now before the court on cross-motions for summary judgment. Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). For reasons that follow, the court holds that the law and the undisputed facts warrant summary judgment declaring the challenged procedures unconstitutional and enjoining their further use against Birl.

### I.

The parties do not dispute the following facts, which the court has culled from the evidence submitted.

Birl, who is in his late thirties, has suffered from mental disorder for at least seven years. He has been hospitalized for this disorder at least ten times. He has also frequently received treatment from doctors outside hospitals.

On August 4, 1982, Birl's mother filed a petition in the probate court of Marengo County, Alabama, to have Birl involuntarily civilly committed to the custody of the Alabama Department of Mental Health. The court ordered Birl's commitment on August 9, 1982, and the next day he was arrested and brought for admission to Bryce Hospital.[1]

Bryce Hospital personnel examined and interviewed Birl and apparently also spoke to his mother and his wife. According to one record, Birl's wife "reported that she first noticed her husband becoming sick approximately five years ago. 'About March of every year it starts.'"

On December 3, 1982, Bryce Hospital personnel granted Birl a "temporary visit" with his mother for fourteen days. According to the evidence, a temporary visit is a release for a predetermined period of time, not exceeding fourteen days, for therapeutic or recreational purposes. Birl does not challenge the temporary visit policy to which he was subjected.

On December 17, 1982, Birl returned to Bryce Hospital for further evaluation. At that time, hospital personnel determined that he should be released on a "trial visit." The only applicable written policy of the department for such visits was as follows:

Patients who are placed in the community on trial visit from the hospital and for whom a request for readmission is pending must be screened by the local community mental health center for evaluation prior to readmission. Criteria used to assess the appropriateness of readmission will be the same as those used for new admissions. All community resources should be exhausted prior to readmission to the state facility. When readmission is considered, the appropriate facility will be contacted by the local community mental health center for final acceptance of the patient.

In addition, Bryce Hospital's October 1982 "Clinician's Guide to Admissions and Releases" stated that a trial visit

indicates the patient is released into the community as a test of his ability to cope. Such patients are retained on the hospital rolls and, if in need of further inpatient psychiatric treatment, are allowed to return to the hospital anytime within six (6) months without new commitment proceedings. Such patients will be automatically discharged at the end of this six month period if they have not returned to the hospital for further treatment.

In his deposition, Dr. Charles Duane Burgess, clinical director of Bryce Hospital at the time of Birl's commitment, gave a more detailed description of how trial visits operated at that time. According to Burgess, the decision to release a civilly-committed patient on a trial visit is made by a psychiatrist in consultation with the other members of the patient's "treatment team," usually a psychologist, a social worker, and a nurse. The patient is released on trial visit with instructions to continue with medication and therapy previously prescribed. Arrangements are made for the patient to visit a community mental health center for continuity of care. The Department of Mental Health contracts with such centers for this purpose.

Bryce Hospital relies on the community mental health centers to recommend that a patient be returned from a trial visit if necessary. A psychiatrist, psychologist or social worker at a center makes such a recommendation by calling the admitting officer at Bryce Hospital. Bryce Hospital personnel at times attempt to verify the reasons given for the return of a patient

---

1. The probate judge who committed Birl was originally a defendant in this lawsuit; however, the judge and Birl reached a settlement in which the judge admitted that Birl's commitment violated constitutional requirements. Birl is no longer pursuing his claim regarding the commitment itself.

from a trial visit but are not required to do so.

A patient may be returned to Bryce Hospital voluntarily or involuntarily. Upon return, the patient is usually seen by a psychiatrist right away. In any event, a psychiatrist must make the decision to readmit the patient. According to Burgess, "the decision is made on a case-by-case basis by the Community Mental Health Center and their decision is to return them for [the treatment] team or the psychiatrist on-call to evaluate for return or for readmission." The psychiatrist who decides to readmit a patient from a trial visit is thus not always the psychiatrist on the treatment team making the original decision to release the patient.

Release on trial visit may well represent a patient's full release from commitment. If not returned from trial visit after six months, the patient is discharged from the hospital's rolls and must undergo new commitment proceedings to be recommitted. However, if returned from trial visit during the first six months, the patient remains on the rolls as though there had been no release at all.

Birl testified by deposition regarding his release on trial visit on December 17, 1982. That day, he returned from his temporary visit as scheduled and met with his treatment team, which had to approve the trial visit. The team also told him what to do during the trial visit.

[Birl.] Well, they told—say take your medicine for one thing, try to get along with others, they say go to mental health and try to situate yourself back into the community.

Q. Okay. Did they tell you anything that would happen if you didn't do all of that, follow all those conditions?

[Birl.] Yes.

Q. What did they tell you?

[Birl.] You would be recalled.

\* \* \* \* \* \*

Q. Did you agree to those conditions to be placed on trial visit?

[Birl.] You have to, [it is] the only way you can get out.

What transpired during Birl's trial visit is not entirely clear. Until March 1983, there were apparently no events of note. The medical records for March 3, 1983, include the following "Emergency Call Record" taken by Martha Dunn, a counseling psychologist at West Alabama Mental Health Center:

REFERRAL SOURCE: General Public
BRIEF STATEMENT OF PROBLEM: Leroy has been off his medication and is becoming manic in his actions. He has been making threats to public officials and to his family. He is not sleeping, is not eating, is becoming violent in behavior.—Calls made for pick-up order to return him to Bryce—no result—Home visit made to evaluate behavior.

ACTION TAKEN: Bryce will take him if he is returned the first of next week.
DISPOSITION RECOMMENDATIONS: Return to Bryce. .

Bryce Hospital records include an "Initial Contact" form which stated in part:

March 3, 1983: Ms. Martha Dunn, West Alabama Mental Health Center representative, called regarding the need to return Mr. Birl from his trial visit placement.... As of today, Mr. Birl has been in the community calling up the attorney and judges, threatening several local people. He has been acting out and harassing people. He apparently was taken off his medication by a local physician due to drawing in his face.

\* \* \* \* \* \*

This information was referred to Dr. Tulao, psychiatrist on Intermediate Treatment, who agreed to accept him as a return from trial visit. As there were no beds available, I notified Ms. Dunn that we would accept him as soon as a bed became available.

In his deposition, Birl denied making any threats to anyone during his trial visit.[2]

2. The factual dispute whether Birl made threats in not material to this cause, since Birl does not

He said that he called a lawyer in Demopolis, as well as the office of the probate judge who committed him. "... I just wanted to know why and what happened and who did it and why they did it. I was just searching for information."

On March 15, 1983, Birl went to the West Alabama Mental Health Center to inquire about the proper dosage of his medication. According to a record of this visit by outpatient counselor Carey H. Mason, Birl was given an appointment for the following week and told to alert clinicians at the center if his condition worsened.

Birl's records also include a report of this visit by Martha Dunn, who had received the earlier complaint about Birl. Dunn's report said that

Leroy was in to clinic—he was verbally abusive to the clients and it was obvious that he has not improved in his feelings. He still needs to go to Bryce. Center Receptionist call the Sheriff's Office in Linden to request that Leroy be picked up and returned to Bryce.

ACTION TAKEN: Leroy returned to Bryce.

In his deposition, Birl said that he did not see Dunn on March 15, but did see Mason. After this visit, he returned home. There, a police officer came and took him back to Bryce Hospital. Birl testified that he did not wish to return.

Once back at Bryce Hospital, Birl tried to learn the reasons for his return. The evidence is in dispute as to whether the hospital staff informed Birl of the reasons for his return. Hospital officials maintain that their practice at the time was to inform patients of the reasons. However, Birl states that

when I was admitted back, I went to see the doctor on order. They told me I had to see the doctor. I asked them why. He told me he would find out and tell me later, but they [are] hush, hush up there. They don't tell you nothing.

The psychiatrist on Birl's treatment team, Dr. Marino S. Tulao, saw him on March 15. His "treatment notes" for that date state, "I don't have any information why he was sent back to Bryce." A record by Tulao for the following day, however, states:

According to reports, he started making threatening phone calls to the judge, to the director of mental health center, and to his attorney. He also was reportedly refusing to take his medication and be followed up by the mental health center.

Birl remained at Bryce Hospital until July 8, 1983, when he was again released on a trial visit. He was discharged from the rolls of Bryce Hospital on January 8, 1984.

On May 11, 1983, Bryce Hospital issued a written policy on trial visits, and on August 27, 1984, the Department of Mental Health issued an expanded version of its written policy. While more extensive than the policies set forth above, neither of these subsequent policies altered the procedures afforded a patient on trial visit that Birl here challenges, except for the addition of the requirement that the hospital give the patient written notice of conditions governing the trial visit.

On August 4, 1983, during his second trial visit, Birl filed this lawsuit. He seeks declaratory and injunctive relief against enforcement against him of the Department of Mental Health's procedures for reconfining patients who have been released on trial visit.

## II.

Before considering the merits of Birl's challenge to his return from the first trial visit, the court must resolve three challenges to its authority to entertain this lawsuit.

claim so much that he should not have been returned from trial visit as simply that the procedures by which he was returned were defective. Indeed, whether Birl should have been

returned is not for this court to decide. The dispute is nevertheless illustrative of what the procedures Birl proposes be implemented would have resolved.

## A.

First, since Birl is not now on a trial visit and, in fact, has been discharged from Bryce Hospital and for now freed of the restrictions of the trial visit policy, the court must consider whether he has standing to pursue declaratory and injunctive relief against enforcement of the procedures for reconfining those on trial visits. Birl must have not only a live claim, but the standing to raise it. "The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979).

The Supreme Court has directly considered the standing of a plaintiff seeking declaratory and injunctive relief in the context of law enforcement and criminal prosecution. In *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Court held that the plaintiff lacked standing to enjoin the police from using a dangerous chokehold on criminal suspects.

> It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.

*Id.* at 107 n. 8, 103 S.Ct. at 1668 n. 8.

The Court in *Lyons* relied on its earlier decision in *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), where it found that plaintiffs had no standing to claim racial bias in criminal prosecutions. The Court said that

> [p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.

*Id.* at 496–97, 94 S.Ct. at 676. Past trouble with the law does not establish standing to challenge future illegal law enforcement or criminal prosecution because "[w]e assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners." *Id.* at 498, 94 S.Ct. at 677; *see also Dudley v. Stewart*, 724 F.2d 1493, 1494 (11th Cir.1984). The court relied on similar reasoning in *Lyons*. *Lyons*, 461 U.S. at 107, 103 S.Ct. at 1668.

Like the plaintiffs in *Lyons* and *O'Shea*, Birl is seeking declaratory and injunctive relief from an allegedly illegal practice whose effects he suffered in the past. He does not seek damages, nor does he purport to represent a class of similarly situated people. The question then is whether Birl can show either "a real and immediate threat of future injury by the defendant," *Lyons*, 461 U.S. at 107 n. 8, 103 S.Ct. at 1668 n. 8, or "continuing, present adverse effects," *O'Shea*, 414 U.S. at 497, 94 S.Ct. at 676, so as to warrant declaratory and injunctive relief.

The fact is that Birl stands before the court in a distinctly different posture from that of the plaintiffs in *Lyons* and *O'Shea*. He is a long-time sufferer of mental disorder who has been hospitalized on numerous occasions, and not someone who once had a brush with the law and may never again. This is a difference recently recognized by the Eleventh Circuit and also supported by a Supreme Court decision regarding the civil commitment of the mentally ill.

In *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir.1984), the Eleventh Circuit faced a standing question quite similar to Birl's in the context of a challenge to the detention of the civilly committed in county jails pending their hospitalization. The court found that the named plaintiff's injury from jail detention was past at the time he was named as a plaintiff. *Id.* at 1456. Nevertheless, the court determined that the plaintiff had standing according to the facts found by the district court. "There is every indication that the named plaintiff could continue to be the subject of involuntary commitment petitions and thereby subject to emergency detention." *Id.* at 1456–

57. The court stressed the difference between this plaintiff and that in *O'Shea*.

> [He] is at risk of being detained in jail not because of volitional acts on his part but because his mental condition would prompt his family, as it has done on two previous occasions, to petition for involuntary commitment.

*Id.* at 1457 n. 7.

The Supreme Court has also recognized that, unlike former criminal convicts, the mentally ill often face a continuing threat of involuntary commitment. In *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), the Court upheld a prison inmate's claim that he had been transferred to a mental hospital without due process, despite the fact that he subsequently had been returned to prison.

> ... [T]he District Court, relying on Jones' history of mental illness and the State's representation that he represented a serious threat to his own safety as well as to that of others, found that Jones "is in fact under threat of being transferred to the state mental hospital...." We see no reason to disagree with the District Court's assessment at that time, and the reality of the controversy between Jones and the State has not been lessened by the cancellation of his parole and his return to state prison....

*Id.* at 486, 100 S.Ct. at 1260; *see also In Re Ballay*, 482 F.2d 648, 651 (D.C.Cir.1973).

■ The facts that Birl presents here show that he does have standing to seek declaratory and injunctive relief against the trial visit procedure. Birl has been hospitalized for a mental disorder approximately ten times over a seven-year period. His records indicate that he had not fully recovered when he was last released from Bryce Hospital. One notation said "[p]atient will possibly do well if he follows prescribed treatment and family attends CMHC [Community Mental Health Center] to educate themselves re: illness." Birl's discharge from Bryce Hospital's rolls six months later resulted from this very passage of time, according to the medical records, rather than from any identified improvement. There is no evidence that Birl has recovered from the illness that brought him to Bryce Hospital in the first place. According to his ex-wife, he becomes ill every year around March. "There is every indication that [Birl] could continue to be the subject of involuntary commitment petitions...." *Lynch v. Baxley*, 744 F.2d at 1456.

If recommitted, Birl will again become subject to the same trial visit policy that he here challenges, with the single change described above. This is a department-wide policy, so it will not matter whether Birl is placed at Bryce Hospital or another institution in Alabama.

In his deposition, Burgess testified that some patients are released without first undergoing trial visits; however, Birl would most likely not be one of these. They are, according to Burgess,

> those patients who have had acute illness, have had rapid remission of their symptoms, so that for all intent they would be considered to be in good remission of their illness, that are showing no signs or symptoms of their illness that other people could see, then, those are the ones that are normally discharged. I am not sure what percentage, but, again, this is a clinical decision, but it would be normally those people who have not been in and out many times.

The evidence shows that Birl has been "in and out many times." On the two occasions he has been released from Bryce Hospital in the past, he has been placed on trial visits. After any future commitment, Birl would most likely undergo a trial visit before being discharged. Birl faces "a real and immediate threat of future injury" from the trial visit policy, such as he alleges he suffered in 1982–83. *City of Los Angeles v. Lyons*, 461 U.S. at 107 n. 8, 103 S.Ct. at 1668 n. 8. Therefore, he does have standing to present his claims and seek declaratory and injunctive relief.

## B.

Next, Wallis and Fetner have suggested that since the filing of this lawsuit Birl's claim has become moot because of the latest written policies governing trial visits.

A claim is moot when there is " 'no reasonable expectation . . .' that the alleged violation will recur . . . and . . . interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *City of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted). "The burden of demonstrating mootness 'is a heavy one.' " *Id.; see also Firefighters' Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).

Wallis and Fetner contend that Birl's claim became moot with the issuance of the latest written policies on trial visits. These policies appear to have added only one procedural requirement to prior practice in effect at the time of Birl's release, as described by Burgess. The single new requirement is that patients must be informed in writing, not just orally, of the conditions of the trial visit prior to release.

Since Birl's challenge to trial visit procedures attacks more than the lack of written notice of conditions prior to release, the policies have not "completely and irrevocably eradicated the effects of the alleged violation," *City of Los Angeles v. Davis,* 440 U.S. at 631, 99 S.Ct. at 1383, and his claim is therefore not moot.

## C.

Finally, Wallis and Fetner contend that Birl's avenue of relief is by way of habeas corpus procedures, 28 U.S.C.A. § 2254, rather than section 1983. They note that habeas corpus procedures require exhaustion of state remedies before a federal action may be commenced and that Birl has failed to meet this requirement. They contend that this court is therefore without authority to entertain this lawsuit.

"Supreme Court cases have continued to delineate the distinction between [a] actions to obtain release from confinement and [b] civil rights actions which challenge the constitutionality of procedures but where a decision of unconstitutionality does not of itself entitle the person in confinement to be released." *Chancery Clerk of Chickasaw County, Mississippi v. Wallace,* 646 F.2d 151, 156–57 (5th Cir.1981) (Unit A). *See, e.g., Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (challenge to denial of good-conduct-time credits requires use of habeas proceedings rather than § 1983 action because requested relief, award of good-conduct-time credits, would result in immediate release of some prisoners and acceleration of release of others); *Gerstein v. Pugh,* 420 U.S. 103, 107 n. 6, 95 S.Ct. 854, 859 n. 6, 43 L.Ed.2d 54 (1975) (allowing a § 1983 challenge to pretrial custody procedures since "release was neither asked nor ordered"). The former are habeas actions and require exhaustion. The latter are generally section 1983 actions, which do not require exhaustion under *Patsy v. Board of Regents of the State of Florida,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

Here, Birl is merely challenging the procedures by which his first trial visit was revoked. He is not seeking release from confinement. His lawsuit is therefore properly premised on section 1983. *See, e.g., Chancery Clerk of Chickasaw County, Mississippi v. Wallace,* 646 F.2d at 155–58.

## III.

Having concluded that Birl may pursue his claim, the court must now determine whether the claim is valid.

## A.

It is now axiomatic that involuntary civil commitment imposes a "massive curtailment of liberty," *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), "that requires due process protection" under the fourteenth amendment to the U.S. Constitution. *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). The

490

Supreme Court has held that even a prisoner, whose constitutional rights are greatly reduced, *see Hudson v. Palmer*, —— U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), has an interest warranting protection when he is considered for commitment for mental illness. *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).

■ The fact that Birl's trial visit was only a conditional release makes no difference, for the Supreme Court has explicitly recognized the existence of the liberty interest for persons conditionally released from confinement in the context of parole revocations. In *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court held that the state could not revoke parole without following certain minimum procedures. The Court required these procedures because "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id.* at 482, 92 S.Ct. at 2601.

Parole and the trial visit program share several characteristics. First, both constitute a conditional release intended to permit the parolee or patient to demonstrate that he can function in society. "The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person." *Id.* at 482, 92 S.Ct. at 2600. Similarly, the trial visit is "a test of . . . ability to cope," according to Bryce Hospital's manual. Furthermore, both the parolee and the mental patient on trial visit enjoy considerable liberty. "Subject to the conditions of his parole, [the parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id.* at 483, 92 S.Ct. at 2600. Birl was equally free from restraints on trial visit, for the evidence showed that Birl was required only to "try to situate [himself] back into

the community" and to continue with therapy and medication. In light of the similarities between parole and trial visits, the Court's conclusions in *Morrissey* clearly apply. Regardless of the fact that Birl's release on trial visit was only conditional, therefore, he was still entitled to certain procedural protections before his release could be terminated. As the Court noted in *Morrissey*, "the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process[.]" *Id.* at 482, 92 S.Ct. at 2601.

At least two other courts have relied on *Morrissey* to reach the conclusion that patients who have been conditionally released cannot be reconfined without being given some procedural protections. *See Lewis v. Donahue*, 437 F.Supp. 112, 114 (W.D.Okl. 1977) (three-judge court); *Meisel v. Kremens* 405 F.Supp. 1253, 1257 (E.D.Pa.1975); *see also C.R. v. Adams*, 649 F.2d 625 (8th Cir.1981). In *Lewis*, for example, the three-judge court held that

a statute which permits the revocation of outpatient or convalescent leave without notice or opportunity to be heard prior to institutionalization is infirm for failure to comport with the due process clause of the Fourteenth Amendment of the Constitution of the United States.

*Lewis*, 437 F.Supp. at 114. As *Lewis* makes clear, due process requires that mental patients such as Birl be given certain basic procedural safeguards before they are returned from trial visit.

B.

Wallis and Fetner argue that while reconfinement could conceivably require due process protection in some cases, no such protections are required here because the decision to reconfine Birl was made by a private party and not the state. According to Wallis and Fetner, the facts show that Birl was returned from the trial visit by personnel from West Alabama Mental Health Center, which is a private facility, rather than the state-run Bryce Hospital. Based on this interpretation of the facts,

Wallis and Fetner contend that the fourteenth amendment does not even come into play because there was no state action.

▬ Wallis and Fetner's position has no basis in the record. The evidence indicates that the decision to readmit Birl was made by Dr. Tulao of Bryce Hospital based on a report to him from the Bryce Hospital admitting officer who in turn had received a call from West Alabama Mental Health Center recommending that Birl be returned. That Tulao acted on information and advice from others does not mean that his actions were not his own. Indeed, his involvement was in accordance with department policy, as described by Burgess, which requires psychiatrists to effect all returns from trial visits.

▬ Even assuming that the community mental health center was at least partially responsible for Birl's return, Wallis and Fetner are not absolved. The department of which they are supervisory employees has contracted with the community mental health centers, according to Burgess, to do just what they did to Birl. Regardless of the "private" status of the centers, they are sufficiently involved with the state to be considered state actors. *See American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce,* 698 F.2d 1098, 1109 n. 19 (11th Cir.1983). The private facility's role in Birl's reconfinement was minimal, but in any case the centers must be considered to be state actors. Having suffered a deprivation of liberty as a result of state action, Birl was entitled to basic due process protections.

### C.

▬ There can be no question that Birl was denied the safeguards of due process.

▬ Due process requires "that a deprivation of life, liberty, or property, 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill,* —— U.S. ——, ——, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). This requirement certainly was not met here, for Birl was reconfined without any prior notice or opportunity for hearing. The West Alabama Mental Health Center requested and Bryce Hospital accepted Birl's reconfinement without giving Birl a reasonable opportunity to challenge the decision, either before he was reconfined or within a reasonable time thereafter. All Birl received was notice of the reasons for his reconfinement, and that came only after he had already been returned and apparently only when he specifically asked. Since an after-the-fact notification of the reasons for confinement hardly meets the due process requirements identified in *Loudermill,* the court concludes that Birl was denied the protections to which he was entitled.

### IV.

A determination that Birl was entitled to and denied due process leads to the question of what process is due. *See Santosky v. Kramer,* 455 U.S. 745, 754, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court explained that the nature of the procedure required in a given situation depends upon three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 336, 96 S.Ct. at 903.

### A.

Without specifically addressing the three factors set forth in *Mathews,* Wallis and Fetner rely on *Williams v. Wallis,* 734 F.2d 1434 (11th Cir.1984) to argue that the

current procedures are sufficient. *Williams* held that due process does not require persons committed to the Alabama mental health system after having been acquitted of a criminal offense by reason of insanity to be given adversarial proceedings. *Williams* is inapplicable to the present case, however, because the procedures used and the interests at stake are so different for patients deemed criminally insane and patients who are civilly committed.

The procedures used in *Williams* kept "the risk of an erroneous deprivation" of liberty, the second *Mathews* factor, extremely low. First, the decision whether to release a patient was made by a treatment team that had followed that particular patient's progress from the date he was committed and was therefore quite familiar with the patient's condition. Furthermore, the treatment teams were made up of medical professionals who "certainly have no bias against the patients or against release.... [W]e can safely assume they are disinterested decision-makers." *Id.* at 1438. Finally, the treatment teams saw the patients quite often, and "the frequency of the evaluations also reduces the risk that the patient will be confined any longer than necessary." *Id.*

The procedures used to reconfine Birl are in sharp contrast to those at issue in *Williams*. Under the Mental Health Department's procedures, a patient on a trial visit could be reconfined on the basis of an unconfirmed report by an unnamed member of the public or because someone in a community mental health center disagreed with the diagnosis of the psychiatrist who originally recommended the trial visit. Indeed, when Birl was first returned to Bryce, the psychiatrist on his treatment team did not even know the reasons for his reconfinement. Unlike the situation in *Williams*, Birl had no assurance that the

decision to reconfine him would be made by someone who was reliable, knew him well, and saw him frequently. There is therefore a much higher risk of erroneous deprivation of liberty in Birl's situation, and thus the procedural safeguards must be correspondingly more stringent.

■ An additional factor indicating that *Williams* is inapplicable is that the government does not have the same interest in the continued commitment of the civilly committed patient as it does in that of the criminally insane. As the court noted in *Williams*, "[t]he state's interest in preventing the premature release of individuals who have already proven their dangerousness to society by committing a criminal act is substantial." *Id.* at 1439. The government has considerably less interest in reconfining civilly committed patients, for these patients have not committed crimes and in fact may be guilty of nothing more than unusual or bizarre behavior. Because the government's interest in reconfining a patient such as Birl is relatively weak, it will have to provide more elaborate procedural safeguards than required by *Williams*. Of the three factors articulated in *Mathews*, only one—the private interest—was the same for the *Williams* plaintiffs and for Birl. The other two factors both indicate that Birl is entitled to more protection than the non-adversarial procedures upheld in *Williams*.

### B.

■ While it is clear that Birl should be given more protection than he received or that was provided in *Williams*, the record is not sufficient to determine exactly what procedures are required.[3] In arguing against the present procedures, Birl has made clear the private interest in avoiding unexplained or unnecessary reconfinements. There may also be a private inter-

---

**3.** In fact, it is not entirely clear from the record what the current procedure is. For example, it appears that patients on trial visit are reconfined only after a hearing before a probate judge in some counties, but the court cannot tell with certainty from the record whether this is indeed true.

est in assuring that prompt medical attention is available for recurring mental disorders, however, and this interest should certainly be taken into account when developing reconfinement procedures. Before the first *Mathews* factor can be addressed, therefore, the parties must define the exact nature of the private interest.

Further explanation of the government's interest is also necessary. The record as it stands does not make clear the government's interest in the release and reconfinement of mental patients, nor does it establish the extent of the fiscal and administrative burdens that new procedures might impose. Finally, the record fails to address directly either the risk of erroneous deprivation or the likely value of additional procedures. Without a more thorough presentation of all three *Mathews* factors by the parties, it is impossible to determine which specific procedures should be implemented.

The court also considers it primarily the task of the state, through its legislature or administrative agencies, to identify the proper procedures for reconfinement decisions. *See Lewis v. Donahue,* 437 F.Supp. at 114. So far, such procedures have been patently lacking. The court will therefore provide Wallis and Fetner with the opportunity to propose detailed, written procedures within a fixed period of time in conformance with constitutional requirements. The court will also provide Birl an opportunity to review and respond to the proposed procedures. The parties are encouraged to agree on these procedures, if possible. The court will then require the parties to submit their proposed procedures with evidence substantiating their basis according to the *Mathews v. Eldridge* factors. The court will review them on this basis and determine whether they provide due process or require alteration. For this purpose, the court retains jurisdiction over this cause.

An appropriate judgment will be entered.