Ricky **WYATT, By and Through his Aunt and Legal Guardian Mrs. W.C. RAWLINS, Jr., et al., Plaintiffs,**

**Diane Martin, et al., Plaintiff–Intervenors,**

v.

**Royce G. KING, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants,**

**United States of America, et al., Amici Curiae.**

**Civ. A. No. 3195–N.**

United States District Court, M.D. Alabama, N.D.

July 22, 1991.

Ira Burnim, Mental Health Law Project, Washington, D.C., for plaintiff Wyatt.

R. Emmett Poundstone, III, and Rick Trawick, Ala. Dept. of Mental Health, Montgomery, Ala., Joel Kline, Christopher Cerf, Washington, D.C., for King and Dept. of Mental Health.

Andrew J. Barrick and Mitchell W. Dale, and Pamela Chin, Special Litigation Sec-

tion, U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for U.S.

Byrd R. Latham, Patton, Latham, Legge & Cole, Athens, Ala., for Gunter, Steagall and Brassell.

David Ferleger, Philadelphia, Pa., Reuben Cook, Edward Stevens, Victoria Farr, and Donald Tipper, Ala. Disabilities Advocacy Pro., Tuscaloosa, Ala., for intervenors Martin, et al.

Peter G. Thompson, Sandra Lord, Washington, D.C., for plaintiffs.

Algert Agricola, Mark Montiel, and David Byrne, Montgomery, Ala., for State defendants.

R. David Christy, Montgomery, Ala., for King.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

In 1974, then-Chief United States District Judge Frank M. Johnson, Jr., writing on behalf of a three-judge district court, found that Alabama's procedures for involuntary civil commitment of the mentally ill to state institutions did not comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala.). Judge Johnson set forth and imposed on the state "those standards and safeguards which, at a minimum, the Due Process Clause requires for the protection of persons whose liberty is placed in jeopardy as a consequence of their becoming the subjects of civil commitment proceedings against their will." *Id.* at 387. Seventeen years later and in another lawsuit, this court is now confronted with an equally important question from the other end of the commitment process: what procedures, if any, the state must adopt to ensure that mentally ill persons civilly confined against their will are released when their confinement is no longer necessary. Based upon the evidence and briefs submitted by the parties, the court holds that the state should be required to conduct post-commit-ment periodic judicial reviews, using the same "standards and safeguards" articulated in *Lynch*, to determine when persons who have been involuntarily civilly confined due to mental illness should be released.

## I. BACKGROUND

Since its inception in 1970, this ongoing litigation has focused primarily on the conditions in the state's mental health and mental retardation facilities. *See, e.g., Wyatt v. Stickney (Wyatt I)*, 344 F.Supp. 373 (M.D.Ala.1972) (Johnson, J.) (establishing minimum constitutional standards for the adequate care and treatment of mentally ill patients), *aff'd in part, rev'd in part, and rem'd in part*, 503 F.2d 1305 (5th Cir.1974); *Wyatt v. Stickney (Wyatt II)*, 344 F.Supp. 387 (M.D.Ala.1972) (Johnson, J.) (establishing minimum constitutional standards for the adequate care and treatment of mentally retarded patients), *aff'd in part, rev'd in part, and rem'd in part*, 503 F.2d 1305 (5th Cir.1974). On January 25, 1991, Diane Martin and eleven other patients in Alabama's mental health institutions intervened as plaintiffs in this litigation. These intervenors, sometimes referred to as the "Martin intervenors," asserted a number of new claims, including the one now before the court: that the state fails to provide adequate procedures for the release of those patients who no longer meet the requirements for involuntary civil confinement of the mentally ill. As the court will explain below, this new claim can be viewed as the third chapter in a continuing effort to bring the state's involuntary civil commitment procedures up to constitutional muster.[1]

*Chapter I: Lynch v. Baxley.* In 1974, this court found that Alabama's then-existing civil commitment statutes for the mentally ill violated due process in large part because they provided inadequate notice, allowed detention without a probable cause hearing within a reasonable period of time, did not require the presence at the hearing

---

**1.** The Martin intervenors also challenge the constitutionality of the treatment afforded residents at one of the state's facilities, the Thomasville Adult Adjustment Center. This claim has been severed and will be heard by the court later.

of the person to be committed, did not require counsel, and contained ill-defined standards for commitment. *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala.1974) (three-judge court) (Johnson, J.). The starting point of *Lynch* was a presumption that all civil commitments by probate courts in Alabama were involuntary and that, absent a knowing and intelligent waiver, all persons the state sought to be committed had to be afforded basic due process protections. The court stated that,

> all Alabama probate court commitments are to be presumed involuntary unless and until there has been a judicial determination in an adversary proceeding during which the person proposed to be committed is represented by counsel, that the commitment is in fact a voluntary one, knowingly and intelligently consented to by the person to be committed. In the absence of any such judicial determination, the commitment proceedings are involuntary as a matter of law and must comply with the following minimum standards.

386 F.Supp. at 387. The court imposed on the state a number of minimum standards and procedures which it considered to be required by the due process clause. In the judgment which accompanied the memorandum opinion entered on December 14, 1974, the three-judge court succinctly articulated these standards and procedures as follows:

> (a) Adequate notice of the hearing and its purpose shall be given sufficiently in advance of the scheduled proceedings to permit a reasonable opportunity to prepare therefor.
>
> (b) The person proposed to be committed or recommitted shall have the right to attend the hearing unless the Court, after appropriate inquiry, determines that he is so mentally or physically ill as to be incapable of attendance.
>
> (c) The subject of the hearing shall be informed of his right to counsel and to the appointment of counsel if indigent. Where the recommitment of a presently confined patient is sought, a guardian *ad litem* who is an attorney shall be appointed.
>
> (d) Any person now unlawfully confined shall be entitled to independent expert examination and assistance in preparation for the hearing, by means of court appointment where he cannot afford to retain such services.
>
> (e) If recommitment hearings are to be conducted on the hospital premises, they shall take place in surroundings as noncoercive as possible. In no event shall such hearings be held in patients' quarters. Appropriate street dress shall be made available to each subject, if not already available to him.
>
> (f) No person shall be committed or recommitted unless the probate judge finds:
>
> (i) That he is mentally ill;
>
> (ii) That he poses a real and present threat of substantial harm to himself or to others;
>
> (iii) That the danger has been evidenced by a recent overt act of the individual;
>
> (iv) That there is treatment available for the illness diagnosed or that confinement of the dangerous but untreatable individual is necessary for his and the community's safety and well-being; and
>
> (v) That commitment or recommitment is the least restrictive alternative necessary and available for treatment of the person's illness.
>
> (g) The necessity for commitment or recommitment must be proved by evidence which is clear, unequivocal, and convincing.
>
> (h) At the hearing, the subject shall have the right to offer evidence, to be confronted with the witnesses against him and to cross-examine them, and the privilege against self-incrimination. The rules of evidence applicable in other judicial proceedings in this state shall be followed in involuntary commitment proceedings.
>
> (i) A full record of the proceedings, including findings adequate for review, shall be compiled and retained by the probate court.

(j) Nothing contained in this Order shall be construed to limit the power of the guardian *ad litem* to waive any of his client's rights when, in his judgment and in the judgment of the probate judge after appropriate findings of fact, waiver is in the best interests of his client.

In response to the memorandum opinion and judgment of the court, Alabama enacted new statutes governing the involuntary civil commitment of the mentally ill. These statutes are found at 1975 Alabama Code §§ 22–52–1 through 22–52–37 (Michie 1990).[2]

*Chapter II: Birl v. Wallis.* In the mid-1980's, this court was confronted with a challenge to the constitutionality of the procedures used by Alabama to recommit individuals who had been released from state mental health hospitals for "trial visits." The court found that, because these patients at the time they are released on trial visits have improved to the point that they have a constitutional right to an unconditional discharge, returns from trial visits are equivalent to initial commitments and thus require that the procedures and standards set forth in *Lynch* be met before patients may be reconfined. *Birl v. Wallis (Birl II)*, 633 F.Supp. 707 (M.D.Ala.1986) (Thompson, J.); *Birl v. Wallis (Birl I)*, 619 F.Supp. 481 (M.D.Ala.1985) (Thompson, J.).

*Chapter III: Wyatt v. King.* In their current complaint-in-intervention filed in early 1991, the Martin intervenors claim that Alabama's indeterminate involuntary civil confinement of the mentally ill violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C.A. § 1983 (West 1981 & Supp.1991). They have properly invoked the jurisdiction of the court pursuant to 28 U.S.C.A. §§ 1331, 1343 (West 1966, 1976 & Supp.1991). They have named as defendants the Commissioner of Mental Health and Mental Retardation and the directors of the various state mental health institutions.

The evidence the Martin intervenors have submitted to the court reflects the following. The State of Alabama neither has a limit on the length of civil commitment nor does it provide for adversarial post-commitment periodic review. Rather, proceedings for release are nonadversarial and made by the personnel of the Department of Mental Health and Mental Retardation without any hearing or review by any independent decisionmaker. There are approximately 1,800 residents in the state's five mental health hospitals, and 90% of these patients were committed involuntarily and thus are there against their will. The intervenors have submitted further evidence which suggests that some of these residents no longer meet *Lynch*'s initial commitment requirements. For example, according to the intervenors, "L.M." was involuntarily committed to the state's mental health facilities in 1970. Over these 20 years, she has never been subjected to any formal procedure to determine whether her continued confinement is appropriate. Indeed, although an evaluating psychiatrist noted in 1986 that foster care would be appropriate for her, no discharge procedures were ever initiated.

---

**2.** Section 22–52–10, for example, provides in relevant part as follows:

(a) If at the final hearing upon a petition seeking to commit a person to the custody of the state department of mental health and mental retardation or such other public facility as the court may order, the probate judge, on the basis of clear, unequivocal and convincing evidence, shall find:

(1) That the person sought to be committed is mentally ill; and

(2) That as a consequence of the mental illness the person poses a real and present threat of substantial harm to himself or to others; and

(3) That the threat of substantial harm has been evidenced by a recent overt act; and

(4) That treatment is available for the person's mental illness or that confinement is necessary to prevent the person from causing substantial harm to himself or to others; and

(5) That commitment is the least restrictive alternative necessary and available for treatment of the person's mental illness; then upon such findings, the probate judge shall enter an order setting forth his findings, granting the petition and ordering the person committed to the custody of the Alabama state department of mental health and mental retardation or to such other public facility as the court may order.

(b) If any such element be unproved, the probate judge shall deny the petition and discharge the subject of the petition sine die.

The Martin intervenors seek both declaratory and injunctive relief requiring that the state conduct post-commitment periodic judicial reviews using the standards and procedures articulated in both the memorandum opinion and judgment in *Lynch.* The intervenors suggest that these reviews be conducted no later than 150 days after the initial commitment and, if the commitment is renewed, annually thereafter. Their proposed relief is as follows:

(1) The initial period of involuntary commitment pursuant to the State of Alabama's civil commitment statutes shall not exceed 150 days.

(2) If the state desires further commitment, the director of the state mental health facility or his designee must file a petition for renewal of a commitment within 30 days prior of the expiration of the initial commitment order. The petition must explain in detail why renewal of commitment is being requested and why less restrictive conditions of treatment are not appropriate.

(3) No renewal of commitment shall exceed a period of one year.

(4) A patient involuntarily civilly committed shall be released if (a) the director of a state mental health facility or his designee does not file a petition for renewal of commitment within the time prescribed, or (b) a state court denies the petition for renewal, or (c) no state-court order renewing commitment is issued before expiration of the current period of authorized commitment.

The defendants do not concede that their current involuntary civil commitment procedures violate the Due Process Clause, but they have agreed that if the procedures are unconstitutional the court may then adopt the intervenors' proposed new procedures and standards as relief.

## II. DISCUSSION

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." The

Martin intervenors charge that Alabama's indeterminate involuntary civil commitment of the mentally ill deprives these persons of their "liberty" without due process of law. In determining whether their claim has merit, the court will engage in a two-part analysis. The court will address, first, whether these persons have a "liberty interest" in being released within the meaning of the Due Process Clause, and, second, if so, what process is due before that interest may be curtailed.

### A.

Persons committed against their will suffer not only a dramatic loss of physical freedom with its severely detailed control and invasive treatment, they also cannot enjoy those mundane, daily pleasures—working, shopping, enjoying the companionship of family and friends, or simply being left alone—the loss of which we on the outside would find to be not only intolerable but a threat to our very sanity. It is therefore not surprising that the United States Supreme Court has characterized involuntary civil commitment of a person in state mental health institutions as a "massive" curtailment of liberty. *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). It is also not surprising that the parties to this litigation have stipulated that, "People confined in state mental health facilities in Alabama under civil commitment suffer a significant deprivation of liberty."[3] The issue for the court is whether, based on the above, the court can further conclude that the failure to release patients who no longer meet the requirements for civil commitment implicates a liberty interest. For the reasons that follow, the court finds that it must so conclude.

In 1972, in *Jackson v. Indiana,* 406 U.S. 715, 720, 92 S.Ct. 1845, 1849, 32 L.Ed.2d 435 (1972), the Supreme Court of the United States held that a state cannot constitutionally commit a person for an indefinite period simply on account of his incompetency to stand trial on the charges filed against him. In reaching this conclusion,

---

**3.** Parties' stipulation H, filed April 8, 1991.

the Court wrote that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.* at 738, 92 S.Ct. at 1858. Implicit in this language was the limitation that the duration of confinement not exceed its purpose.

But what was implicit in the language in *Jackson* became express three years later in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). There, in upholding a challenge by Kenneth Donaldson to his continued confinement against his will in a Florida hospital, the Court observed that, "Nor is it enough that Donaldson's original confinement was founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed." *Id.* at 574–75, 95 S.Ct. at 2494. The Court explained that a state cannot refuse to release mentally ill patients "merely to ensure them a living standard superior to that they enjoy in the private community," *id.*, or "solely to save its citizens from exposure to those whose ways are different." *Id.* The "mere presence of mental illness," the Court continued, "does not disqualify a person from preferring his home to the comforts of an institution." *Id. See also Parham v. J.R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) ("It is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment"); *Addington v. Texas*, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) ("the State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others"); *Birl II*, 633 F.Supp. at 710–11 ("it is well established that a patient must be unconditionally released from involuntary confinement once the grounds for initial confinement cease to exist"); *Stitt v. Department of Mental Health & Mental Retardation*, 562 So.2d 259, 262 (Ala.Civ.App. 1990) ("The State does not have an interest in confining individuals involuntarily if they are not mentally ill or if they do not pose a danger to themselves or others").

Moreover and more specifically, it is not necessary that this court look beyond its own existing orders governing the operation of Alabama's mental health system to conclude that involuntarily confined patients have a liberty interest in immediate release once their confinement is no longer necessary. In its 1972 order establishing minimum constitutional standards for the adequate treatment of the mentally ill, this court listed as one of the standards that, "If the patient no longer requires hospitalization in accordance with the standards for commitment ..., he must be released immediately unless he agrees to continue with treatment on a voluntary basis." *Wyatt I*, 344 F.Supp. at 386 (standard 33).

The conclusion is therefore inescapable that involuntarily civilly confined patients have a liberty interest in being released once the grounds for their confinement cease to exist. When patients have recovered to the point that their condition no longer satisfies the requirements for initial commitment, they must be released.

### B.

■ Having concluded that persons involuntarily confined have a liberty interest in being released immediately if hospitalization is no longer necessary, the court must next determine what process is due to ensure that that interest is not improperly curtailed. The Martin intervenors suggest that, at a minimum, due process requires, first, that the state conduct post-commitment *periodic* reviews and, second, that these reviews be *judicial* in nature using the standards and procedures articulated in *Lynch*. More specifically, the intervenors have submitted a proposal, set forth earlier, requiring that the state, using *Lynch* standards and procedures, review the need for a patient's continued involuntary confinement within 150 days of initial commitment and, if the commitment is renewed, annually thereafter.

The function of due process "is to minimize the risk of erroneous decisions."

*Greenholtz v. Inmates of Nebraska,* 442 U.S. 1, 13, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979). "Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." *Id.* The Supreme Court has indicated that, in determining what procedures are required to minimize this risk in the liberty interest context, a court must balance a number of factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Parham v. J.R.,* 442 U.S. 584, 599–600, 99 S.Ct. 2493, 2502–03, 61 L.Ed.2d 101 (1979), *quoting Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). In applying these factors, this court will consider the interests of the involuntarily civilly committed patient. The court will also examine the interests of the state in the involuntary civil commitment process. And finally, the court will consider whether, in light of these interests, current procedures are insufficient and supplemental ones—in particular, the Martin intervenors' suggested new procedures and standards—are needed to reduce adequately the risk of an erroneous deprivation of a patient's liberty interest.

Identifying the interests at stake is somewhat easy. On the one hand, for the reasons given above, persons civilly committed against their will have a substantial interest in being released once they no longer meet the requirements for commitment. On the other hand, both the involuntary committed and the state have a legitimate interest in the state's provision, through its *parens patriae* powers, of "care to its citizens who are unable because

of emotional disorders to care for themselves." *Addington v. Texas,* 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). The "state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill." *Id.* In addition, both the involuntarily committed and the state have a substantial interest in assuring that the commitment procedures are not so complex and burdensome that they unnecessarily divert scarce public resources from the central objective of providing health care or that they erect unnecessary procedural barriers to the provision of care to those who need it. Medical personnel must be able to devote their time and energy to performing the task for which they were trained, and the commitment process must not be so onerous that family and friends of those in need of state health care abandon the process for less substantively beneficial alternatives for their loved ones.

The more difficult issue is what minimum process is due to reduce the risk of erroneous continued confinement of persons without undercutting the efforts to further the above identified beneficial interests of both the state and the mentally ill in the involuntary civil commitment process. The United States Supreme Court has suggested that a minimum requirement would be some form of post-commitment periodic review. In *Parham v. J.R.,* 442 U.S. 584, 607, 99 S.Ct. 2493, 2506, 61 L.Ed.2d 101 (1979), in rejecting a challenge to Georgia's procedures for the voluntary commitment of children by their parents, the Court wrote that "it is necessary that the child's continuing need for commitment be reviewed periodically." Two United States Circuit Courts of Appeals have similarly suggested that periodic review is required. In *Doe v. Austin,* 848 F.2d 1386, 1395–96 (6th Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 531 (1988), the Sixth Circuit stated that, "Of course, because involuntary commitment cannot continue after the basis for that commitment ceases to exist, due process requires that *some* periodic review take place during

confinement." (Emphasis in original). And in *Clark v. Cohen*, 794 F.2d 79, 86 (3rd Cir.), *cert. denied*, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986), the Third Circuit wrote that "due process required periodic reviews of [a patient's] continuing need for institutionalization." "Periodic reviews are required," the court continued, "because if the basis for a commitment ceases to exist, continued confinement violates the substantive liberty interest in freedom from unnecessary restraint." *Id.*

Two state supreme courts have gone further in their analysis and concluded that the post-commitment review must be both periodic and judicial in nature. In the landmark case of *Fasulo v. Arafeh*, 173 Conn. 473, 378 A.2d 553 (1977), the Supreme Court of Connecticut concluded that reviews of the continued need for confinement must be state-initiated, periodic, and judicial in nature. The court explained that, because the "state's power to confine terminates when the patient's condition no longer meets the legal standard for commitment" and because "the state's power to confine is measured by a legal standard, the expiration of the state's power can only be determined in a judicial proceeding which tests the patient's present mental status against the legal standard for confinement." 378 A.2d at 556. That court further explained that,

> Freedom from involuntary confinement for those who have committed no crime is the natural state of individuals in this country. The burden must be placed on the state to prove the necessity of stripping the citizen of one of his most fundamental rights, and the risk of error must rest on the state. Since the state has no greater right to confine a patient after the validity of the original commitment has expired than it does to commit him in the first place, the state must bear the burden of proving the necessity of re-commitment, just as it bears the burden of proving the necessity for commitment.

*Id.* at 557. Similarly in *In re Harhut*, 385 N.W.2d 305, 312–13 (Minn.1986), the Supreme Court of Minnesota held that a commitment statute which provided for indeterminate commitments accorded with due process only if judicially construed to require that there be continuous representation by counsel, that statutorily mandated annual medical reviews be sent to the committing court and counsel, and that there be judicial review of the committed patient's status "at least once every three years." The state court explained that, "without some periodic judicial review of the mentally retarded, there still exists the possibility, no matter how remote, of a patient falling through the cracks in the bureaucracy and languishing in a mental institution." *Id.* at 312.

There is, of course, binding case law from the Eleventh Circuit which could be read to suggest that the post-commitment review for the involuntarily civilly committed need not be judicial in nature. In *Williams v. Wallis*, 734 F.2d 1434 (11th Cir.1984), the appellate court held that those committed to Alabama's mental health system after being found not guilty of a criminal offense by reason of insanity are not entitled to periodic adversarial release proceedings. The court found that the "probative value of the additional safeguard of adversary hearings is slight." *Id.* at 1438. *Williams* is significantly distinguishable, however. The "due process balance" in *Williams*, where the person involuntarily committed was an insanity acquittee, is quite different from that which must be struck here, where those confined have committed no crime. As the Eleventh Circuit later explained in *Benham v. Ledbetter*, 785 F.2d 1480, 1491 (11th Cir.1986), "an insanity acquittee as compared with a candidate for civil commitment" has a "lessened liberty interest." Indeed, because of this difference, the appellate court in *Benham* found that a presumption of continuing insanity at a commitment hearing for an insanity acquittee did not violate due process. *See also Birl I*, 619 F.Supp. at 492 (*Williams* is inapplicable to recommitment of patients discharged from mental health institutions on trial visits, "because the procedures used and the interests at stake are so different for patients deemed criminally insane and patients who are civilly committed").

Fortunately, although convinced that the law supports post-commitment review that is both periodic and judicial in nature for the involuntarily civilly committed, the court need not rest on legal conclusions alone. The previously described case of patient "L.M."—who has been involuntarily civilly confined for over 20 years—by itself provides a compelling reason why review which is judicial in nature and reasonably periodic is minimally necessary. L.M. has not been adjudicated as having committed any crime. Nevertheless, she has spent more of her life locked away than probably most serious criminal offenders have. The least the state owed her over these many years was a periodic formal hearing, with all the trappings of an initial commitment proceeding, to assure to a reasonably high degree of certainty that her continued confinement was to her and society's benefit as claimed by the state. It cannot reasonably and in good faith be argued that the initial formal commitment hearing she may have received two decades ago—or even a decade and half ago in the wake of *Lynch*—could in any way serve as a basis for such a conclusion. And L.M.'s circumstances and those of similarly situated patients cannot be disregarded as extreme or isolated. Because the involuntary civil commitment of every patient to the Alabama Mental Health and Mental Retardation System is indefinite, all of them are potentially committed for periods as long as, and even longer than, L.M.'s.

Moreover, the parties have entered into factual stipulations which solidly reinforce the court's legal conclusion. First, they agree that under the current procedures—which do not provide for post-commitment periodic judicial review—there is "the risk of the continued hospitalization of a person after the purposes of commitment have been accomplished." [4] They have also agreed that periodic judicial review would reduce this risk while at the same time actually advancing the other beneficial interests of the both state and the mentally ill in the commitment process; they agree that such review would better serve to protect the liberty interest of the involuntarily civilly confined, is medically acceptable, and would otherwise independently serve the interests of the mental health system.[5] With these stipulations, which point in favor of periodic judicial review and in which the state has offered no reason why there should not be such review, the due process balance falls decidedly on the side of review that is both periodic and judicial in nature.

That the court has struck the proper balance is also supported by a canvas of the involuntary civil commitment laws of other states. Although apparently the norm in the United States at one time, indefinite commitment statutes are now almost extinct. *See Procedural Safeguards for Periodic Review: A New Commitment to Mental Patient's Rights*, 88 Yale L.J. 850 (1979); *Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv. L.Rev. 1190 (1974). Alabama is one of only two states in the United States whose statutes still allow for involuntary civil commitment with no provision for "periodic review" of whether that person, once committed, continues to meet the criteria for commitment.[6] *See* Brakel, Parry & Weiner, *The Mentally Disabled and the Law* (3d ed. 1985). Indeed, "[o]ne of the most important changes that has occurred in the commitment laws has been the virtual demise of indeterminate commitment provisions that prevailed in all but a handful of states as recently as 1970." *Id.* at 72.

### III. RELIEF

The parties have agreed that, should the court find that the state must hold post-commitment periodic judicial reviews, the Martin intervenors' proposal—that the reviews use the procedures and standards articulated in both the memorandum opinion and judgment in *Lynch* and that the

4. Parties' stipulation I, filed on April 8, 1991.

5. Parties' stipulations F, G, I, J, K, and L, filed on April 8, 1991.

6. Louisiana is the other state whose statutes allow for indeterminate involuntary civil commitment without post-commitment periodic review.

reviews be conducted within 150 days of initial commitment and, if the commitment is renewed, annually thereafter—should be implemented as the court's remedy. The court will accept and follow this agreement. The court will, however, delay implementation of these new requirements for periodic judicial review.

The court recognizes that those now in the state's mental health institutions—who in some instances may have been there for 20 years or more—have a compelling interest in receiving prompt review of whether they still meet the conditions for commitment. However, the court also shares the parties' concern that setting too short a schedule for implementation system-wide could result in hasty and meaningless proceedings. The defendants will have much to do in preparation for the reviews. For these reasons, the court will require that the defendants and their attorneys, in consultation with counsel for the plaintiffs and the Martin intervenors, formulate a plan for timely and complete implementation of the new requirements. The court will require that the defendants and their counsel submit the plan to the court within 45 days.

## IV. CONCLUSION

In conclusion, the Due Process Clause prohibits the indefinite involuntary civil commitment of the mentally ill without reference to whether they remain mentally ill and dangerous; once a person who has been civilly committed no longer meets the criteria for commitment, he or she must be released. And the necessary corollary to this conclusion is that there must be some form of post-commitment review to determine whether these persons still meet the criteria for commitment. The court is convinced that this review must be judicial in nature and reasonably periodic and that the proposal submitted by the Martin intervenors and to which the defendants have agreed satisfies this command.

Finally, the court would add that the relief it affords today complements, rather than supersedes, all other outstanding obligations the court has placed on the defendants—in particular, that the defendants must immediately release any patient who "no longer requires hospitalization in accordance with the standards for commitment," *Wyatt I*, 344 F.Supp. at 386 (standard 33), and that the defendants must "provide adequate transitional treatment and care for all patients released after a period of involuntary confinement." *Id.* (standard 34). Moreover, because the relief afforded today is the minimum required by the Due Process Clause, the defendants may always adopt procedures which require even more frequent post-commitment judicial review.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of the Martin intervenors and against the defendants on the Martin intervenors' challenge to the State of Alabama's indeterminate involuntary civil commitment of the mentally ill pursuant to 1975 Alabama Code §§ 22–52–1 through 22–52–37 (Michie 1990);

(2) That it be and is hereby DECLARED that the State of Alabama's indeterminate involuntary civil commitment of the mentally ill, without post-commitment periodic judicial review of whether they continue to meet the criteria for commitment, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and

(3) That it be and is hereby DECLARED that the State of Alabama's involuntary commitment of the mentally ill pursuant to the state's civil commitment statutes shall be subject to the following additional procedures:

(A) The initial period of involuntary commitment pursuant to the State of Alabama's civil commitment statutes shall not exceed 150 days.

(B) If the state desires further commitment, the director of the state mental health facility or his designee must file a petition for renewal of a commitment

**1518**

within 30 days prior to the expiration of the initial commitment order. The petition must explain in detail why renewal of commitment is being requested and why less restrictive conditions of treatment are not appropriate.

(C) No renewal of commitment shall exceed a period of one year.

(D) A patient involuntarily civilly committed shall be released if (a) the director of a state mental health facility or his designee does not file a petition for renewal of commitment within the time prescribed, or (b) a state court denies the petition for renewal, or (c) no state-court order renewing commitment is issued before expiration of the then-current period of authorized commitment.

It is further ORDERED that all post-commitment periodic reviews required by the "additional procedures" set forth in this judgment shall also comport with the procedures and standards articulated in both the memorandum opinion and judgment in *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala.1974) (three-judge court).

It is further ORDERED that the defendants and their counsel, after consulting with counsel for plaintiffs and the Martin intervenors, shall submit to the court within 45 days a plan for the timely and complete implementation of the "additional procedures" set forth in this judgment.