**Ricky WYATT, By and Through his aunt and legal guardian, MRS. W.C. RAWLINS, Jr., et al., Plaintiffs,**

**Diane Martin, et al., Plaintiff–Intervenors,**

**v.**

**Royce G. KING, as Commissioner of Mental Health and Mental Retardation, and the State of Alabama Mental Health Officer, et al., Defendants.**

**Civ. A. No. 3195–N.**

United States District Court, M.D. Alabama, N.D.

Jan. 12, 1993.

---

Ira Burnim, Washington, DC, for proposed intervenor Bretz.

Joel Kline, Christopher Cerf, Washington, DC, R. Emmett Poundstone, III, Ricky Trawick, Alabama Dept. of Mental Health, Montgomery, AL, for Horsley and Dept. of Mental Health.

Andrew J. Barrick & Mitchell W. Dale, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for U.S.

Byrd R. Latham, Patton, Latham, Legge & Cole, Athens, AL, for Gunter, Steagall and Brassell.

David Ferleger, Philadelphia, PA, for intervenors Martin, et al.

Reuben Cook, Edward Stevens, Victoria Farr, Donald Tipper, Ala. Disabilities Advocacy Pro, Tuscaloosa, AL, for intervenors Martin, et al.

Peter G. Thompson, Sandra Lord, Washington, DC, Pamela Chen, U.S. Dept. of Justice, Civil Rights Div., Special Litigation Section, Washington, DC, for amicus curiae U.S.

Algert Agricola, Mark Montiel, Montgomery, AL, David Byrne, Montgomery, AL, for State defendants.

R. David Christy, Montgomery, AL, for Horsley.

## ORDER

MYRON H. THOMPSON, Chief Judge.

The Alabama Department of Mental Health and Mental Retardation System currently operates under a consent decree entered by this court on September 22, 1986. In the 1986 decree, the defendants—who consist of various state officials—agreed to reinforce their efforts to bring conditions at state mental health and mental retardation facilities into compliance with minimum standards established by the court in 1972. Six years later, in 1992, the court rejected an effort by the defendants to eliminate several provisions in the 1986 decree, including the 1972 standards that establish patients' rights to dignity, privacy, and humane care and require that treatment be provided in the least restrictive environment. *Wyatt v. King*, 803 F.Supp. 377 (M.D.Ala.1992) (Thompson, J.).

Now before the court is an additional motion from the defendants asking that the court vacate another standard—one which requires that the defendants provide adequate transitional treatment and care for patients released after a period of involuntary confinement in a state mental health facility—or, alternatively, that the court adopt a very limiting construction of the standard. For the reasons that follow, the defendants' motion is denied.

## I. BACKGROUND

Residents of Alabama's institutions for the mentally ill and mentally retarded first challenged the conditions at state institutions in 1971. The following year, after finding that the care afforded the members of the plaintiff class violated their constitutional rights, this court ordered the Department of Mental Health and Mental Retardation to bring the facilities into compliance with certain minimum constitutional standards, now known as the *Wyatt* standards. *Wyatt v. Stickney*, 344 F.Supp. 373 (M.D. Ala.1972) (Johnson, J.) (standards for the mentally ill), *aff'd in relevant part*, 503 F.2d 1305 (5th Cir.1974); *Wyatt v. Stickney*, 344 F.Supp. 387, 392, 394–407 (M.D.Ala.1972) (Johnson, J.) (standards for the mentally retarded), *aff'd in relevant part*, 503 F.2d 1305 (5th Cir.1974). Despite the plaintiffs' apparent victory, the establishment of the *Wyatt* standards proved to be only the first step in an extended struggle to improve the care and services provided to mentally ill and mentally retarded residents of Alabama's institutions. The issue of the defendants' compliance with these standards has continued to generate litigation throughout the 20 years since the court entered its orders in 1972.

In 1975, three years after the adoption of the *Wyatt* standards, the plaintiffs returned to court to determine whether the defendants were in compliance with the court's orders. After four years of litigation, evidence that constitutional violations persisted at state facilities prompted the court to appoint the Governor of Alabama

as receiver of the state system. Under the compliance plan proposed by the Governor and approved by the court, the defendants were to achieve compliance with all but a handful of the *Wyatt* standards within 18 months.

The plaintiffs again returned to court in 1981 seeking to ensure that the defendants had achieved compliance with the *Wyatt* standards as required by the Governor's plan. The defendants, in turn, moved the court to modify the 1972 orders by completely eliminating the standards and substituting in their place a requirement that the defendants obtain accreditation of the state's mental illness facilities by the Joint Commission on the Accreditation of Healthcare Organizations and certification of the mental retardation facilities through Title XIX of the Social Security Act. The defendants sought elimination of the *Wyatt* standards on grounds that these standards exceeded minimum constitutional requirements.

In 1986, the parties submitted to the court a proposed consent decree intended to resolve these outstanding disputes. After conducting a hearing on the objections to the decree, the court agreed to approve the parties' proposal and entered an order and memorandum opinion to that effect on September 22, 1986.[1] The final decree contained three provisions of particular importance to the defendants' pending motion to modify. First, all parties agreed in the decree that all prior orders and standards issued by the court regarding the obligations of the state system, including the original *Wyatt* standards, were to remain in full force and effect and that the defendants would "continue to make substantial progress in achieving compliance" with these orders and standards. Consent Decree of Sept. 22, 1986, at ¶¶ 6, 7. Second, the defendants agreed "to continue to make substantial progress in placing members of the plaintiff class in community facilities and programs." *Id.* at ¶ 9. Final-

ly, the decree dissolved the receivership and freed the Alabama Mental Health and Mental Retardation System from further active judicial supervision. *Id.* at ¶¶ 2–5.

On January 18, 1991, almost five years after the adoption of the consent decree, the defendants moved the court for a finding that they had met their obligations under the decree and for an order terminating the lawsuit. In response to this motion and by agreement of the parties, the court appointed an expert to investigate the factual issues pertaining to the defendants' compliance.[2] The expert's investigation is currently underway.

In addition to this ongoing litigation over conditions at state mental health and mental retardation facilities, the court has also been called upon to review the constitutionality of Alabama's procedures for involuntary civil confinement of the mentally ill. In 1974, in *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala.1974) (three-judge court), this court found that Alabama's then-existing civil commitment statutes failed to provide persons subject to commitment with adequate procedural protections. The court's order set forth the minimum standards and procedures required by the due process clause. In a subsequent round of litigation, the court concluded that the procedures announced in *Lynch* must apply as well to the readmission of any patient who has been released from a state mental health hospital on a "trial visit." *Birl v. Wallis*, 633 F.Supp. 707 (M.D. Ala.1986) (Thompson, J.); *Birl v. Wallis*, 619 F.Supp. 481 (M.D.Ala.1985) (Thompson, J.).

In January 1991, a complaint-in-intervention filed in the *Wyatt* litigation by Diane Martin and eleven other patients in the state's mental health institutions launched a new challenge to the state's involuntary civil commitment laws. Among the claims raised by the "Martin intervenors," as they have become known, was the claim that the state failed to provide adequate procedural protections to ensure that involuntarily civ-

---

**1.** The unreported consent decree and accompanying memorandum opinion may be found at 1986 WL 69194.

**2.** Order of July 2, 1991 (approving and adopting parties' agreement of April 15, 1991); Order of Oct. 25, 1991 (approving and adopting modification of April 15 agreement).

illy committed patients are released once they no longer meet the *Lynch* criteria for commitment. As a result of the Martin intervenors' suit, the court in July of 1991 found that Alabama's indefinite institutionalization of the involuntarily civilly committed was unconstitutional and ordered the defendants to do the following: (1) conduct periodic post-commitment judicial reviews to determine when persons involuntarily confined because of mental illness should be released; (2) conduct these reviews using the standards and safeguards articulated in *Lynch;* and (3) conduct these reviews within 150 days of the initial commitment and, if the commitment is renewed, annually thereafter.[3] The court's order specified that any patient found not to fulfill the *Lynch* criteria for involuntary commitment must be released immediately.[4] *Wyatt v. King,* 773 F.Supp. 1508 (M.D.Ala.1991) (Thompson, J.).

In the memorandum opinion accompanying the 1991 decision, the court explicitly held that the new procedural safeguards "complement[ ], rather than supersede[ ], all other outstanding obligations the court has placed upon the defendants," reiterating in particular that the defendants remained under an obligation to "immediately release any patient who 'no longer requires hospitalization in accordance with the standards for commitment,' *Wyatt I,* 344 F.Supp. at 386 (standard 33), and ... [to] 'provide adequate transitional treatment and care for all patients released after a period of involuntary confinement.' *Id.* (standard 34)." 773 F.Supp. at 1517.

During the court's consideration and resolution of the issue of post-commitment review, the parties have continued to litigate issues relating to the defendants' compliance with the original *Wyatt* standards, now in force by means of the 1986 consent decree. In April 1991, the defendants filed

two motions seeking modification of the decree to eliminate certain requirements, including several provisions in the original *Wyatt* standards. In particular, the defendants sought the elimination of the following: the minimum standards which guarantee patients' rights to privacy, dignity and humane treatment; the standards which mandate the delivery of care and services in the least restrictive environment necessary; and the provision in the consent decree which obligates the defendants to make substantial progress in placing residents of state institutions in community facilities and programs. The court has since denied the defendants' motions, finding no evidence of a significant change in circumstances that would justify modification of the six-year-old decree. *Wyatt v. King,* 803 F.Supp. 377 (M.D.Ala.1992) (Thompson, J.).

On November 25, 1991, the defendants filed the pending motion seeking the elimination of another *Wyatt* standard, Standard 34, which obligates them to provide class members with adequate transitional services following release from a state facility. Standard 34 provides that:

"The Mental Health Board and its agents have an affirmative duty to provide adequate transitional treatment and care for all patients released after a period of involuntary confinement. Transitional care and treatment possibilities include, but are not limited to, psychiatric day care, treatment in the home by a visiting therapist, nursing home or extended care, out-patient treatment, and treatment in the psychiatric ward of a general hospital."

*Wyatt,* 344 F.Supp. at 386. The defendants alternatively request that, should the court decline to vacate Standard 34, the court hold that the defendants may fully

---

**3.** Recognizing that development and implementation of procedures for conducting these commitment reviews would not be a simple task, the court allowed the defendants a reasonable period of time to develop an implementation plan with the cooperation of the plaintiffs and the Martin intervenors. After several delays, the defendants began the required post-commitment judicial reviews in January 1992.

**4.** In a subsequent order, the court clarified that a patient's "dangerousness" for recommitment purposes could be established by evidence providing some factual basis to support the hospital staff's recommendation that recommitment is necessary. *Wyatt v. King,* 781 F.Supp. 750 (M.D.Ala.1991) (Thompson, J.).

discharge their obligations under the standard by (1) placing patients in existing programs as space permits, without creating any new programs or services to accommodate patients' needs, and (2) providing post-release care to each patient for a maximum period of one year following the patient's release.

## II. STANDARD FOR MODIFICATION OF A CONSENT DECREE[5]

Modification of a consent decree, like modification of any judgment or order, is formally governed by Rule 60(b) of the Federal Rules of Civil Procedure. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. ——, ——, ——, 112 S.Ct. 748, 757, 761, 116 L.Ed.2d 867 (1992). Rule 60(b) authorizes a court to modify a final judgment or court order at any time if it finds that "the judgment has been satisfied, ... or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application, or [for] any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(5)–(6). Traditionally, courts have required parties seeking modification of a consent decree under Rule 60(b) to demonstrate that continued application of the decree would result in "grievous wrong" on account of new and unforeseen conditions. *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932).

Over the last 15 years, however, several courts—including the Court of Appeals for the Eleventh Circuit—have suggested that application of such a rigid standard is inappropriate when the decree in question arises out of "institutional reform litigation." *See, e.g., Hodge v. HUD*, 862 F.2d 859 (11th Cir.1989) (per curiam); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956 (2d Cir.), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983); *Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d 1114 (3d Cir.1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). In light of the detailed

provisions of some of these decrees, and the likelihood that they will remain in effect for a substantial period of time, these courts agreed that "judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, to improvement when a better understanding of the problem emerges, and to accommodation of a wider constellation of interests than is represented in the adversarial setting of the courtroom." *Carey*, 706 F.2d at 969; *see also Hodge*, 862 F.2d at 863 (quoting *Carey*). The critical question for these courts was whether the proposed modification would further the primary goals of the decree. *Hodge*, 862 F.2d at 864 (court focuses on underlying purpose of the decree); *Carey*, 706 F.2d at 969 (same). If so, modification may be permitted without a showing that the decree has been transformed into an "instrument of wrong." *Swift*, 286 U.S. at 115, 52 S.Ct. at 462.

The Supreme Court recently confirmed that parties need not demonstrate "grievous injury" to obtain modification of a consent decree that is designed to effect structural reform. The decision in *Rufo v. Inmates of Suffolk County Jail* announced a more flexible, two-part standard for determining when modification of such decrees is appropriate. 502 U.S. at ——, 112 S.Ct. at 760; *see also Jacksonville Branch, NAACP v. Duval County School Bd.*, 978 F.2d 1574, 1582 (11th Cir.1992). First, the party seeking modification of the decree "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at ——, 112 S.Ct. at 760. The party may satisfy this initial burden "by showing either a significant change in factual conditions or in law." *Id.* The Court identified several situations in which a significant change in factual conditions could warrant modification of a decree. Modification could be appropriate where a change in conditions has made compliance with the decree "substantially more onerous." *Id.*

---

**5.** The court has discussed the evolution of the standard applicable to modification of a consent decree in greater detail in responding to the

defendants' previous requests to vacate some of the *Wyatt* standards. *Wyatt*, 803 F.Supp. at 382–85.

Modification could also be appropriate "when a decree proves unworkable because of unforeseen obstacles" or, lastly, "when enforcement of the decree without modification would be detrimental to the public interest." *Id.* While the change in circumstances need not have been unforeseeable, it must at least have been unforeseen: "Ordinarily, ... modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* Modification of the decree may be appropriate where there has been an intervening change in the governing law, such that one or more of the obligations the decree imposes upon the parties has been made impermissible under federal law or, conversely, the law has changed to make legal what the decree was designed to prevent. *Id.* at ——, 112 S.Ct. at 762.

■ Second, if the moving party meets this standard, the court then considers "whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at ——, 112 S.Ct. at 760. "A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor," *id.* at ——, 112 S.Ct. at 764; rather, any modification to the decree must be directly responsive to the problem created by the changed circumstances. *Id.*

■ The *Rufo* court recognized that, in applying this two-part standard, a court must take into consideration the effect of the proposed modifications on the underlying purpose of the consent decree. Where the defendant requests a modification that is clearly designed to further the goals of the decree, for example, the court may be more flexible in its application of the two-part test. *Id.* at —— n. 6, 112 S.Ct. at 758 n. 6. Similarly, if the proposed modification concerns only minor details of the decree and does not affect the decree's purpose, the court may forgo application of the *Rufo* standard altogether. *Id.* at —— n. 7, 112 S.Ct. at 760 n. 7. On the other hand, if the modification would in any manner frustrate or undermine the decree's purpose, the court must proceed with extreme caution in reviewing the justification for the proposed changes. *Id.* at ——, 112 S.Ct. at 762; *see also Hodge,* 862 F.2d at 864; *Wyatt,* 803 F.Supp. at 385.

## III. DISCUSSION

Although the defendants present this request as a motion to vacate Standard 34 of the 1972 *Wyatt* standards, they acknowledge that the *Wyatt* standards have been incorporated into the 1986 consent decree. The defendants' request must therefore be understood as a motion for modification of the 1986 consent decree and, as the parties both recognize, the relevant question for the court is whether there has been a significant change in circumstances since 1986 such that continued enforcement of Standard 34 would be inequitable.[6] The defen-

---

**6.** The plaintiffs and the Martin intervenors suggest that the defendants' motion should be viewed as an impermissible collateral attack on the court's 1991 decision, which requires the defendants to institute a system of periodic post-commitment judicial reviews of each patient involuntarily committed. They base this characterization on the following remarks, contained in the final paragraph of the memorandum opinion accompanying the 1991 order:

"Finally, the court would add that the relief it affords today complements, rather than supersedes, all other outstanding obligations the court has placed on the defendants—in particular, that the defendants must immediately release any patient who 'no longer requires hospitalization in accordance with the standards for commitment,' *Wyatt I,* 344 F.Supp. at 386 (standard 33), and that the defendants must 'provide adequate transitional treatment and care for all

patients released after a period of involuntary confinement.' *Id.* (standard 34)."

*Wyatt,* 773 F.Supp. at 1517. The plaintiffs and the Martin intervenors contend that, with this language, the 1991 order, independently of all previous *Wyatt* orders, imposes an obligation upon the defendants to provide adequate transitional treatment, and they conclude that the defendants' failure to appeal from the 1991 order bars any further challenge to Standard 34.

The plaintiffs and the Martin intervenors read too much into this language. In the opinion's closing paragraph, the court was doing exactly what it said it was doing: recognizing the outstanding obligations that were already in place, and observing that the relief afforded in the 1991 decision did not in any way free the defendants from their responsibility to comply with these other, pre-existing obligations. Since the continued validity of the 1972 *Wyatt* standards or of the 1986 consent decree was not before the

dants assert that modification is warranted both by changes in the state of the law since 1986 and by developments in this case which, they contend, have significantly altered the factual background. Before addressing each of these contentions, the court first considers the effect of this latest modification request on the goals of the 1986 consent decree. *Rufo*, 502 U.S. at ——, 112 S.Ct. at 762; *Hodge*, 862 F.2d at 859; *Wyatt*, 803 F.Supp. at 385.

### A. *The purpose of the 1986 consent decree*

■ The court has already considered the purpose of the 1986 consent decree in evaluating the defendants' earlier requests for modification of the decree. *Wyatt*, 803 F.Supp. at 385–86. Without repeating here the discussion of the competing concerns balanced in the decree, the court reiterates the three areas of dispute which the decree was intended to resolve: (1) the plaintiffs' concern about the continued validity of the *Wyatt* standards; (2) the plaintiffs' efforts to expand the focus of the litigation to include the provision of community placements; and (3) the defendants' request to terminate court supervision of the state system. The question of the plaintiffs' right to constitutionally adequate services was not the focus of the decree in 1986, as that issue had been litigated in 1972 and resolved in favor of the plaintiffs.

At the risk of repetition, the court returns again to the language of the memorandum opinion accompanying the decree in 1986, in which the court discussed the competing concerns animating the consent decree and the trade-offs accepted by each side:

> "To be sure, the settlement here offers both substantial pluses and substantial minuses for the plaintiff class.... The first significant plus is that the settlement preserves the integrity and force of the court's prior historic standards and orders. This settlement provision may not appear at first blush to be that sig-

nificant and substantial, but it is. After the initiation of the last round of litigation, which was in substantial part a vigorous frontal attack by the defendants on the continued validity of the court's prior standards and orders, a number of appellate decisions cast substantial doubt on whether these standards and orders could withstand the challenge. As both the plaintiffs and the defendants now correctly observe, the incorporation of these standards into a settlement makes these standards and orders unsusceptible to challenges because of present and future changes in the law. Without question, one of the most significant things bargained away by the defendants in order to secure the plaintiffs' approval of the settlement is the defendants' vigorously asserted and often repeated contention that the court's prior standards and orders are always subject to attack because of present and future changes in the law."

*Wyatt*, 803 F.Supp. at 386 (quoting memorandum opinion of Sept. 22, 1986, at 8–9 (citations omitted)). The plaintiffs, therefore, made a substantial and significant trade: they gave up any claim to the court's continued supervision of the Mental Health and Mental Retardation System in return for, among other things, the right to have all legal and factual issues regarding the validity of the 1972 *Wyatt* standards placed beyond challenge, with the only possible future dispute over the standards being whether the defendants have finally achieved full compliance with them.

The defendants do not question that, of the standards preserved under the 1986 consent decree, Standard 34 is one of the most fundamental. Under the standard, the defendants cannot simply dump into the community those patients who no longer meet the *Lynch* criteria; instead, the defendants have the residual obligation to provide those transitional services needed for these patients to move from a condition of institutional dependence towards one requiring the exercise of more social indepen-

---

court at that time, a single reference to Standard 34 in the opinion would provide insuffi-

cient basis for an appeal.

dence. As the defendants admit, "The evident purpose of [Standard 34] was to assure that patients were not simply released from the hospital with no follow-up program designed to facilitate their return to the community." [7]

Nevertheless, the defendants' principal request is for the court to remove this legal obligation altogether, to vacate the standard without replacing it with another. Because of the critical role Standard 34 and the other *Wyatt* standards played in the bargaining process which led to the 1986 consent decree and because of the fundamental importance of Standard 34 to the patients in Alabama's mental health and mental retardation facilities, the court must be circumspect in its application of *Rufo* to the defendants' request.

## B. *Changes in the law*

The defendants argue that the court should modify the 1986 consent decree in light of the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the Supreme Court held that the substantive component of the due process clause of the fourteenth amendment to the United States Constitution placed no affirmative duty on a state agency to protect a child from parental abuse even though the state had previously taken steps to protect the child from his father's violence, including taking the child into temporary state custody. *Id.* at 201, 109 S.Ct. at 1006.

The impact of *DeShaney,* according to the defendants, is two-fold. First, they claim that *DeShaney* has clarified that a state has no constitutional obligation to provide care and treatment for individuals who have been released and are no longer involuntarily committed to the state's custody. The defendants argue that, because *DeShaney* has thus deprived Standard 34 of its constitutional underpinning, the standard should be eliminated from the 1986 consent decree. Second, the defendants contend that *DeShaney* represents a change in the law which underlay the parties' assumptions at the time they entered into the consent decree.

■ First, as the court discussed in some detail in the order denying the defendants' previous requests for modification, the fact that a consent decree may impose obligations in excess of the constitutional minima does not, without more, provide grounds for modification of the decree. *Wyatt,* 803 F.Supp. at 387–88.[8] Thus, the fact that the remedy adopted by the parties in response to constitutional violations exceeds what the Constitution requires does not provide grounds for modification. There is no requirement that a remedy adopted by the parties in a consent decree adhere to some "constitutional floor," *Rufo,* 502 U.S. at ——, 112 S.Ct. at 764; rather, it is enough if the chosen remedy is demonstrably "related to" the unconstitutional conditions. *Id.* at ——, 112 S.Ct. at 763. The defendants do not contend that Standard 34 is unrelated to the unconstitutional conditions found to have existed when the standard was first imposed in 1972 and to have allegedly continued to exist when the 1986 consent decree was adopted.

■ The court is similarly unpersuaded by the defendants' second argument. The

---

7. Defendants' brief filed on June 24, 1992, at 7.

8. *See also Rufo,* 502 U.S. at ——, 112 S.Ct. at 762–63 ("But we have no doubt that, to 'save themselves the time, expense, and inevitable risk of litigation,' petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires ..., but also more than what a court would have ordered absent the settlement") (internal quotations and citation omitted); *id.* at ——, 112 S.Ct. at 764 ("officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation"); *Suter v. Artist M.,* 502 U.S. ——, ——, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992) ("parties may agree to provisions in a consent decree which exceed the requirements of federal law"); *Local Number 93, Internat'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986) (consent decree may "provide[ ] broader relief than the court could have awarded after a trial").

defendants correctly point out that, under *Rufo*, modification of a consent decree may be appropriate if subsequent decisions clarifying the relevant law reveal that the parties based their original agreement on a misunderstanding of the governing law. 502 U.S. at ——, 112 S.Ct. at 763. In *Rufo*, for example, the consent decree, which was designed to remedy unconstitutional conditions in a county jail, not only required that the defendants provide inmates with individual cells but further stated that the decree's requirements were " 'both constitutionally adequate and constitutionally *required.*' " *Id.* (emphasis added in original).[9] The Supreme Court indicated that if this was, in fact, the parties' belief, this misunderstanding of the law could form a basis for modification. *Id.*

The defendants acknowledge that, at the time the parties entered into the 1986 consent decree, both sides were aware that the *Wyatt* standards arguably exceeded constitutional minima. Such a claim had been raised by the defendants in several motions filed between 1981 and 1986 in which they sought to have all of the *Wyatt* standards vacated.[10] This doubt concerning the minimum constitutional standards arose out of the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). *Romeo* suggested, according to the defendants, that the substantive-due-process rights of involuntarily committed patients to certain conditions of confinement should be given a less expansive reading than that espoused by this court when it formulated Standard 34 in 1972. The defendants concede, as the court found when it rejected the defendants' previous requests to modify the 1986 consent decree, that because *Romeo* was decided in 1982, four years before the consent decree, they cannot in good faith claim

that the decision subsequently clarified a misunderstanding they may have had about the law when they entered into the decree in 1986. *Wyatt*, 803 F.Supp. at 386–87. The defendants argue, however, that *Romeo* did not discuss the distinction subsequently drawn in *DeShaney* in 1989 that, although the state has a constitutional obligation for the "safety and general wellbeing" of individuals involuntarily confined to its care, *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005, that obligation does not in general terms continue after they have been released from state custody. *Id.* at 201, 109 S.Ct. at 1006. *DeShaney*, the defendants contend, did clarify the law after entry of the 1986 consent decree. A close analysis of the defendants' argument reveals, however, that it is meritless.

That in *Romeo* and *DeShaney* the Supreme Court confronted different constitutional issues is not by itself determinative of whether the defendants are entitled to modification under *Rufo*. As previously emphasized, a subsequent clarification in the law would provide grounds for modification if the evidence establishes that the parties agreed to the provisions in the consent decree because they believed them to be constitutionally mandated. *Rufo*, 502 U.S. at ——, 112 S.Ct. at 763. Therefore, critical to the defendants' argument is whether the parties to the 1986 consent decree believed Standard 34 to be constitutionally mandated based upon some misunderstanding of pre-*DeShaney* law. There is no evidence to support this conclusion. On the contrary, as has been repeatedly stated by the court, recognition that the *Wyatt* standards, including Standard 34, might not survive constitutional challenge was the defendants' principal bargaining chip in securing the plaintiffs' agreement to the consent decree.[11] The defendants

9. *See also Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 437–38, 96 S.Ct. 2697, 2705–06, 49 L.Ed.2d 599 (1976) (modification appropriate where decree, as interpreted by district court, was contrary to intervening law); *Nelson v. Collins*, 659 F.2d 420, 428–29 (4th Cir.1981) (en banc) (vacating order based on assumption that double bunking was *per se* unconstitutional).

10. *See, e.g.,* Defendants' motion for modification filed May 19, 1982 (seeking abrogation of all *Wyatt* standards).

11. *See* memorandum opinion of Sept. 22, 1986, at 8–9, 1986 WL 69194 (noting that "a number of appellate decisions cast substantial doubt on whether these [*Wyatt*] standards could withstand the challenge."); Plaintiffs' summary of

did not rely on some misunderstanding of the law later addressed in *DeShaney*.

In any event, the court cannot agree with the defendants' assessment of *DeShaney*'s import for patients discharged from the state mental health system. In explaining the basis for the state's affirmative duty to provide for the care and protection of persons involuntarily committed to its custody, the Supreme Court wrote that the duty "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1006. Standard 34 is not based on some generalized notion of community care—of the state's general knowledge of its citizens' need for community care and treatment or of its expressions of intent to meet this need—but rather on the limitation the state itself has imposed on patients through involuntary institutionalization. Standard 34 merely embodies the residual obligation placed upon the state by the due process clause to provide those transitional services necessary for a patient to move from a condition of institutional dependence, brought about when the state took the patient into custody against his will, towards one in which he will have to exercise more social independence.

C. *Changes in factual circumstances*

It is unclear whether the defendants are contending that they are entitled to have Standard 34 eliminated because of changed *factual* circumstances. In the brief that accompanied their motion for modification, they made such a contention. But in the brief they submitted in response to the briefs filed by the plaintiffs and the Martin intervenors, they omitted reference to this issue.[12] The court will nevertheless assume that the defendants are still contending that there have been changed factual circumstances warranting the elimination of Standard 34.

The defendants contend that this court's 1991 decision—condemning Alabama's indeterminate institutionalization of the involuntarily civilly committed and mandating periodic judicial review of commitment decisions—has created a significant change in factual circumstances because the defendants may no longer keep patients who do not meet the *Lynch* criteria hospitalized until space becomes available in an appropriate community program. The defendants contend that, prior to the 1991 decision, their practice was to keep class members in the hospital until appropriate community placements became available, regardless of whether a particular patient continued to meet the *Lynch* standards for involuntary commitment. Under this system, in which the provision of post-discharge care turned on the availability of an appropriate placement, the defendants found "compliance" with Standard 34 to be relatively painless because they did not believe they were obligated to create new community services to meet patients' needs. In light of the court's 1991 decision, however, the defendants now believe that "it is no longer possible to continue to hospitalize patients involuntarily on the basis of their clinical needs."[13] Deprived of the option to keep patients institutionalized pending the availability of appropriate post-release care, the defendants now seek to be relieved of the obligation of Standard 34. The court must reject for several reasons this basis for eliminating Standard 34. First, the court's 1991 decision did not create any new legal obligation to the extent it stated that the defendants were obligated to release immediately into the community with adequate transitional services those

---

argument in support of approval of consent decree filed Aug. 27, 1986, at 2–3.

**12.** In their reply brief the defendants stated that "The principal issues presented by defendants' motion ... are (1) whether the decision in *DeShaney* ... constitutes a change in law ... and (2) whether Standard 34 should in any event be interpreted so as to require 'transitional' servic-

es for discharged patients only for a limited time period and only to the extent that relevant programs and services exist in the State." Defendants' reply brief, filed on June 24, 1992, at 1.

**13.** Defendants' Brief filed on Nov. 25, 1991, at 10.

patients who no longer met the criteria for initial commitment; the court merely reaffirmed existing obligations.[14] Included in the 1972 order establishing minimum constitutional standards was Standard 33, which provided that "If the patient no longer requires hospitalization in accordance with the standards for commitment ..., he must be *released immediately* unless he agrees to continue with treatment on a voluntary basis." *Wyatt*, 344 F.Supp. at 386 (emphasis added).[15] It was no accident that, in the sequence of *Wyatt* standards, this standard immediately preceded Standard 34, which requires that the state provide transitional care for these patients once released. Together, these two standards established a scheme which was intended to assure that involuntarily confined patients who no longer meet the criteria for commitment will not be unnecessarily held in confinement but rather will be immediately released into community settings with adequate transitional services. Moreover, in 1972, this court specifically rejected the suggestion that the lack of community facilities would excuse any failure to comply with the *Wyatt* standards, holding that "the unavailability of neither funds, nor staff and facilities, will justify a default by defendants in the provision of suitable treatment for the mentally ill." *Wyatt*, 344 F.Supp. at 377.

The principal import of the 1991 decision, in contrast, is that it established the procedures the state must follow in meeting its obligation under the scheme established by Standards 33 and 34. Under the 1991 decision, the defendants must do the following: conduct periodic post-commitment judicial reviews to determine when persons involuntarily confined because of mental illness should be released; conduct these reviews using the standards and safeguards articulated in *Lynch;* and conduct these reviews within 150 days of the initial commitment and, if the commitment is renewed, annually thereafter. The defendants' argument that it was not until the 1991 decision that they had an obligation to release *immediately* into adequate community settings those patients who no longer meet commitment criteria is completely meritless.

But second and more troubling is the fact that defendants even make this argument. With their argument, the defendants implicitly admit that, in order not to comply with Standard 34, they consciously violated Standard 33, with the result that they have essentially ignored both standards over the years. Now that the court has brought to an end their noncompliance with Standard 33, they seek to be relieved of compliance with Standard 34 so that they can continue with their overall noncompliance with the scheme established under both standards. They seek to bring the court into complicity with their unexcused failure for over 20 years to comply with both Standards 33 and 34. In this, the court cannot acquiesce. To the contrary, it is this court's heavy responsibility finally to bring the defendants into immediate and full compliance with both standards.

At points in their briefs, the defendants appear to suggest that implementation of the 1991 decision has led to an overwhelming increase in the number of patients requiring transitional services and that, if the court construes Standard 34 as requiring the creation of new community-based residential and programmatic opportunities for patients following release, this change in circumstances warrants modification. Under *Rufo*, "Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." 502 U.S. at

---

**14.** *See* note 6, *supra.*

**15.** *See also O'Connor v. Donaldson,* 422 U.S. 563, 574–75, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975) ("A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely.... [There is] no constitutional basis for confining [the mentally ill] involuntarily if they are dangerous to no one and can live safely in free-

dom"); *Birl,* 633 F.Supp. at 710–11 ("it is well established that a patient must be unconditionally released from involuntary confinement once the grounds for initial confinement cease to exist"); *Wyatt,* 773 F.Supp. at 1513 (discussing other cases holding, prior to the 1986 consent decree, that the state must release from involuntary confinement patients who no longer meet the criteria for initial confinement).

——, 112 S.Ct. at 760. There is, however, no evidence before the court of any actual change in the number of patients discharged pursuant to the recommitment hearings, nor any factual evidence that would indicate that compliance with Standard 34 has, in fact, become "substantially more onerous." At most, the defendants suggest that compliance with Standard 34 may become burdensome and unworkable in the future. Absent more support for this claim, speculation about future demands for transitional care does not provide adequate justification for relieving the defendants of their commitment to provide "adequate transitional care and services" at the present time.

### D. The defendants' alternative request for "clarification"

 The defendants request, in the alternative, a "clarification" of Standard 34. They ask that the court construct the standard to mean that the defendants may fully discharge their obligations by (1) placing patients in existing programs as space permits, without creating any new programs or services to accommodate patients' needs and (2) providing post-release care to each patient for a maximum period of one year following the patient's release.

Standard 34 requires that the defendants provide "adequate" transitional care and treatment for all patients released after a period of involuntary confinement. The defendants argue that the plaintiffs and the Martin intervenors want them to build new community facilities and to provide extensive post-release services to meet the requirements of Standard 34. There is no evidence before the court, however, that existing community programs are inadequate to meet the transitional requirements of Standard 34, and, similarly, there is no evidence before the court that one year of post-release services would be inadequate to meet the needs of involuntarily commit-

ted patients. The court declines to enter into some hypothetical debate among the parties about whether, absent the requested limiting interpretation, the defendants can meet the demands of Standard 34.

But more importantly, the adoption of the above limiting interpretation of Standard 34 without any factual development would be arbitrary. As stated, the standard requires that the defendants provide "adequate" transitional care and treatment. While there is nothing before the court to support a finding that existing community programs and one year of post-release services would be inadequate to meet the needs of involuntarily committed patients under Standard 34, there is also nothing upon which the court could rest a conclusion that existing community programs and one year of post-release services would be adequate. Absent some factual basis for the limitations the defendants would place on the language of Standard 34, the court declines to adopt the limitations.[16]

Finally, the defendants' alternative request for clarification is really one for modification. Labelling their motion as one for clarification rather than modification does not alter the fact that the effect of their proposed "clarifications" would be to modify the decree substantially. Admittedly the term "adequate" in Standard 34 is open-ended in the sense that it provides for no discrete limits. However, it is apparent that this was intended by the court: under the standard, the Department of Mental Health and Mental Retardation must tailor its transitional care and treatment to the individual needs of patients; what would be adequate for one patient might not be so for another. In contrast, the defendants' proposed limiting interpretation provides that patients are entitled to only one year of existing programs and services, irrespective of whether this would be adequate. The proposed interpretation is on its face

---

**16.** As stated earlier, in response to a motion to terminate this litigation filed by the defendants on January 18, 1991, the court approved an expert to review the defendants' compliance with the 1986 consent decree. The defendants' alleged concerns about their ability to comply

with Standard 34 may or may not be borne out by the expert's report. In any event, these concerns can be adequately addressed by the court when the report is finished and the defendants' motion to terminate this litigation is ready to be heard.

substantially at odds with the plain language of Standard 34. Because, as the court has shown above, the defendants have failed to demonstrate a significant change in circumstances, they are not entitled to such a fundamental modification of the 1986 consent decree.

Accordingly, for the reasons given above, it is the ORDER, JUDGMENT, and DECREE of the court that the motion to vacate Standard 34, filed by the defendants on November 25, 1991, be and it is hereby denied.